UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| STEPHANIE C. STALEY, individually and on behalf of all other similarly situated </br></br>    Plaintiff, </br></br>v. </br></br>WILSON COUNTY, TERRY ASHE, JAMES SMITH, KIM ROBERTS, STEVE EVERETT, JAMES CHRISTENSEN, EDMOND JONES, CITY OF MT. JULIET, BONNIE HARRIS, KEVIN MACK, </br></br>    Defendants. | Case No. 3:04-1127 </br> Judge Trauger |

## MEMORANDUM

This matter comes before the court on a Motion for Class Certification filed by the plaintiff, (Docket No. 28), to which the defendants have responded (Docket No. 32), and the plaintiff has replied, (Docket No. 38). For the reasons discussed herein, the plaintiff's motion will be granted.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The plaintiff, Stephanie C. Staley, was arrested at a Mt. Juliet sobriety checkpoint on December 19, 2003, by police officer Bonnie Harris, a named defendant in this case.[1] Ms. Staley was not driving, but rather sitting as passenger in her boyfriend's truck. Nevertheless, Officer Harris engaged in a conversation with Ms. Staley at the checkpoint, during which Ms. Staley

---

[1]Unless otherwise noted, the facts have been drawn from the plaintiff's First Amended Complaint (Docket No. 3, attach. Compl.) and the plaintiff's Brief In Support of its Motion for Class Certification (Docket No. 29).

1

admitted to having had "six or seven beers." On that basis, without asking Ms. Staley to exit the car for further examination, or in fact performing any sort of sobriety test on Ms. Staley, Officer Harris informed Ms. Staley that she was under arrest. When Ms. Staley asked why she was under arrest, Officer Harris offered, by way of explanation: "Don't make me tell you again to step out of the vehicle."

Ms. Staley was handcuffed and told to wait for a vehicle to transport her to the police station. In the intervening time, Officer Harris did not question Ms. Staley further. Ms. Staley alleges that she had consumed the "six or seven beers" over the course of twelve hours, along with food, and would have offered this information to Officer Harris had the opportunity presented itself.

Five to ten minutes later, transportation arrived in the form of a patrol vehicle, driven by defendant Kevin Mack, the Mayor of Mt. Juliet. It is alleged that, aside from his mayoral duties, Mayor Mack serves as a reserve police officer for the Mt. Juliet Police Department, and it was in that capacity that he taxied Ms. Staley to the police station. Along the way, Ms. Staley asked Mayor Mack why she was being arrested. Mayor Mack responded "public intoxication," and, when Ms. Staley asked whether she could call someone to pick her up, he responded "no." Mayor Mack offered, presumably in order to console Ms. Staley, that public intoxication was "not a big deal" and that "they will give you a phone call and you'll just have to wait eight hours." Mayor Mack suggested that she plead guilty and pay a $250 fine.

After they arrived at the station, Mayor Mack remained with Ms. Staley, filled out some paperwork, and tried further to console her. But his efforts appear not to have had the salutary effect he intended, for when he left, a female corrections officer chided the plaintiff, "who's little

2

Ms. Hottie-Tottie that the Mayor has to bring her in?" While she was being booked, Ms. Staley was told that she should just plead guilty and pay a $250 fine, because her bail would be set at $2,500, and she would have to pay close to $250 to a bail bondsman anyway. Ms. Staley declined that invitation. Ms. Staley was told to remove her personal items and shake her bra in front of male officers, and was put in a holding tank, barefoot. At no time does she appear to have been given a breathalyzer test or any other sobriety test.

While in the holding tank, Ms. Staley heard her boyfriend arrive at the station and tell the officers he had a broken back. Looking out of the window of her cell door, the plaintiff saw Officer Harris push her boyfriend in the back. Ms. Staley shouted, "Oh my God, his back is really broken, don't do that, you could paralyze him." Officer James Smith, a named defendant, attempted to close the flap over the plaintiff's cell window, but was not entirely successful. A few moments later, Ms. Staley was able to get Officer Smith's attention; he opened the cell door, and she told him that her boyfriend's back really was broken and to be careful because rough treatment could result in serious injury. Second, she asked when she would be able to make a phone call. Officer Smith slapped Ms. Staley's hands and closed the door without making any verbal response.

The plaintiff appears to have complained loudly about that treatment from within her cell. In response, Officer Smith and another officer opened the door. The plaintiff alleges that, seeing the unnamed officer raise a can of mace, she backed against the cell wall and raised her hands, and said, "you need to get out of here, you've already smacked me, that's enough," at which time, the officer sprayed her with mace. Then the two officers left the cell and closed the flap over the window successfully.

3

The plaintiff next threatened to call Channel 2 News, at which time her cell mate awoke and advised her to calm down. Eventually Officer Smith returned with two other officers and removed the plaintiff's cell mate. The plaintiff alleges that Officer Smith sprayed mace at her a second time and then pounded her head against the concrete floor four or five times. The plaintiff alleges that Officer Smith stood up and kicked her while she lay on the floor and then sprayed mace at her a third time with a long, steady stream. The plaintiff alleges that other police officers watched these events and did not intervene.

Ms. Staley's bond was set at $2,500 by Charlie Churchwell, a part-time judicial commissioner. Originally, Mr. Churchwell set the bond at $500 but, based on the "way she was acting towards authority figures," Mr. Churchwell raised the amount to $2,500 by adding a "2" in front of the "500." (Churchwell Dep., Docket No. 29, Ex. 5 at p. 5, 6.) Ms. Staley alleges that she was not questioned about any of the criteria outlined in T.C.A. § 40-11-115 concerning her likelihood to appear in court or whether she was a flight risk. Specifically, she was not questioned about her length of residence in the Mt. Juliet area, her employment status, her financial condition, her family ties in the community, or her prior criminal record. In fact, Ms. Staley's bail was set without her even seeing Mr. Churchwell, the judicial commissioner. Ms. Staley paid a bail bondsman $280 in order to secure her release although, she alleges, each of the conditions in T.C.A. § 40-11-115 would have weighed in favor of her release on her own recognizance. The bail bondsman suggested, once again, that Ms. Staley plead guilty, and that she could mail in the $250 fine with a signed document in order to end the matter.

The plaintiff alleges that it is the policy and practice of Wilson County to set bail for arrested individuals based on the offense charged rather than under the statutory criteria, and in

4

many cases, to set bond before actually questioning a suspect. As a matter of policy, bond amounts are not set pursuant to the statutory guidelines. At least one judicial commissioner sets bond pursuant to a formula "from out of my head." (*Id*. at p. 3.) Routinely, police officers request that bail be increased because a suspect has been "disrespectful," and often the judicial commissioners comply with the request. Wilson County gives each judicial officer a manual which states, "[w]hen setting a bond, take into consideration the nature of the charge. Make the bond compatible with the charge." According to one judicial commissioner, "[b]ond is often set before a defendant is even in custody." (Hale Dep., Docket No. 29, Ex. 6 at p. 2.) According to another judicial commissioner, bond should be set "according to the crime," and, as a matter of policy, it should not be set below $250. (Hankins Dep., Docket No. 29, Ex. 10 at p. 6-7.)

Another judicial commissioner, as a matter of policy, sets all his bonds at a minimum amount of $1,000, because a bail bondsman will not "touch any bond" under that amount. (Jenkins Dep., Docket No. 29, Ex. 8 at p. 7.) Judicial commissioners are sometimes discouraged from releasing arrested persons on their own recognizance. One commissioner alleges that a criminal court judge "yell[s] and curs[e]s you out" for releasing persons on their own recognizance and otherwise "makes you feel kind of small." (*Id*. at p. 9.) Many judicial officers appear not to know exactly how release on one's own recognizance ("ROR") works, or whether such bonds typically have dollar amounts set with them, and one judicial officer, at the time of her deposition, did not know what "ROR" stood for. (Swindell Dep., Docket No. 29, Ex. 9 at p. 2.) The same judicial officer reported that she would increase a bond amount in retaliation for acts amounting to "disrespect" against her, because a person who "disrespects" her also "disrespects" the judicial system and is, on that basis, a flight risk. (*Id*. at p. 15-18.) In addition,

5

the plaintiff has offered evidence that Wilson County follows a practice of "investigative holds" where subjects are held without bond for a short time for questioning. (Hankins Dep., Docket No. 29, Ex. 10 at p. 20-25.)

On December 20, 2004, the plaintiff filed this action in this court. On December 21, 2004, the plaintiff filed a First Amended Complaint. (Docket No. 3.) On June 13, 2006, the plaintiff filed a motion for class certification for the following claims: (1) violation of 28 U.S.C. § 1983 through a policy and practice of setting bail excessively, and (2) violation of T.C.A. § 40-11-115 and T.C.A. § 40-11-118 through, as a matter of policy, failure to consider the factors listed in those sections when setting bail or an unsecured bond. On July 11, 2006, the defendants responded in opposition to the motion for class certification.

## ANALYSIS

### I.  Standard for Class Certification

Rule 23 of the Federal Rules of Civil Procedure sets forth a two-part analysis for determining whether a class action can be maintained. First, the plaintiff must establish the requirements of Rule 23(a): "(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class." *Rutherford v. City of Cleveland*, 137 F.3d 905, 909 (6th Cir. 1998).

Second, if the plaintiff is able to satisfy those requirements, he or she must demonstrate that the class should be certified under at least one of the three categories of class actions described in Rule 23(b). Those categories are:

6

> (1) [Where] the prosecution of separate actions by or against individual members of the class would create a risk of (A) inconsistent or varying adjudications with respect to individual members of the class, or (B) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests; or
>
> (2) [Where] the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or
>
> (3) [Where] the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy . . . . Fed. R. Civ .P. 23(b).

The principal purpose of a class action is to achieve efficiency and economy of litigation, both with respect to the parties and the courts. *See Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 155-58 (1982). In *Falcon*, the Supreme Court observed that, as an exception to the general rule that parties bound by a litigation must participate in it, "[c]lass relief is 'peculiarly appropriate' when the 'issues involved are common to the class as a whole,' and when they 'turn on questions of law applicable in the same manner to each member of the class.'" *Id*. at 155 (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700-01 (1979)). Further, the Supreme Court directed that, before certifying a class, district courts must conduct a "rigorous analysis" of whether the plaintiff has satisfied his burden of meeting the prerequisites of Rule 23(a) of the Federal Rules of Civil Procedure. *Falcon*, 457 U.S. at 161. The Sixth Circuit has held that district courts have broad discretion in deciding whether to certify a class, but it has also directed that courts must exercise that discretion within the framework of Rule 23. *Coleman v. Gen. Motors Acceptance Corp.*, 296 F.3d 443, 446 (6th Cir. 2002); *In re American Medical Sys., Inc.*, 75 F.3d 1069, 1079 (6th Cir. 1996).

7

A court considering class certification may not inquire into the merits of the underlying claim, *Eisen v. Carlisle & Jacqueline*, 417 U.S. 156, 178 (1974), and should accept the complaint's allegations as true for the purposes of deciding the class certification motion. *See Reeb v. Ohio Dep't of Rehab. & Corr.*, 81 Fed. Appx. 550, 555 (6th Cir. 2003). However, a class action may not be certified merely on the basis of its designation as such in the pleadings, and "it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question." *Falcon*, 457 U.S. at 160; *see also American Medical Sys.*, 75 F.3d at 1079; *Weathers v. Peters Realty Corp.*, 499 F.2d 1197, 1200 (6th Cir. 1974). A plaintiff must present "an adequate statement of the basic facts to indicate that each requirement of the rule is fulfilled." *American Medical Sys.*, 75 F.3d at 1079 (quoting *Weathers*, 499 F.2d at 1200). With this standard in mind, the court turns to an analysis of the plaintiff's claims.

## II. Rule 23(a) Analysis

The court must first analyze all four prerequisites of Rule 23(a)—numerosity, commonality, typicality, and adequacy of representation—in determining whether to grant class certification. Fed. R. Civ. P. 23(a); *American Medical Sys.*, 75 F.3d at 1079. Only if the court finds that those prerequisites have been satisfied, must it then address whether "the party seeking certification also . . . demonstrate[s] that it falls within at least *one* of the subcategories of Rule 23(b)." *American Medical Sys.*, 75 F.3d at 1079 (emphasis in the original); *see also Senter v. Gen. Motors Corp.*, 532 F.2d 511, 522 (6th Cir. 1976), *cert. denied*, 429 U.S. 870 (1976). For the reasons outlined below, the court finds that the plaintiff has met the four Rule 23(a) prerequisites.

### A. Numerosity

8

As the plaintiff points out, in civil rights cases, such as this one, the numerosity requirement "is usually satisfied by the showing of a colorable claim by the named plaintiff who is a member of the larger class having potentially similar clams." *Weathers v. Peters Realty Corp.*, 499 F.2d 1197, 1200 (6th Cir. 1974). In general, the Sixth Circuit directs the court to determine whether joinder of all members would be impracticable and, in so doing, there is no "specific number below which class action relief is automatically precluded." *Senter*, 532 F.2d at 523, n. 24. However, a large number of potential class members, such as more than several hundred, can in and of itself demonstrate such impracticability. *Bacon v. Honda of Am. Mfg. Inc.*, 370 F.3d 565, 570 (6th Cir. 2004). Impracticability of joinder does not mean that joinder would be impossible but, instead, that it would pose a hardship or inconvenience in litigation. *See Chesher v. Neyer*, 215 F.R.D. 544, 546 (S.D. Ohio 2003).

Factors that courts should consider in determining whether joinder is impracticable include the number of class members, geographical dispersion of class members, the injunctive nature of the action, how easily class members can be identified, judicial efficiency, fear of harassment, and the relatively small size of individual claims. *See* Alba Conte & Herbert Newberg, *Newberg on Class Actions* §§ 24:16, 24:18 (4th ed. 2003); *see also Jack v. American Linen Supply Co.*, 498 F.2d 122, 124 (5th Cir. 1974) (holding that joinder was impracticable, and the numerosity requirement had been met, in part because the class included "unnamed, unknown future black employees . . . and joinder of unknown individuals is certainly impracticable").

The plaintiff's alleged class includes all former, current, and future individuals who are or have been presented to a Wilson County judicial commissioner for the setting of bail. The

9

plaintiff alleges that, although the exact number of potential class members is uncertain, that number will easily exceed 10,000. The defendant has stated that Wilson County sets bail approximately 600 to 800 times per month. That would include between 36,000 and 48,000 potential class members just from over the past five years. By sheer numbers alone, the plaintiff has satisfied the numerosity requirement.

Moreover, the plaintiff has satisfied numerosity by stating a colorable claim that Wilson County, as a matter of policy, sets bail excessively, in violation of the Fourth, Fourteenth and Eighth Amendments. The Supreme Court has held that, under the Eighth Amendment's directive that "[e]xcessive bail shall not be required," U.S. Const. Amend. VIII, "the fixing of bail for any individual defendant must be based upon standards relevant to the purpose of assuring the presence of that defendant." *Stack v. Boyle*, 342 U.S. 1, 5 (1951). Under the Supreme Court's framework, although the state can define criminal conduct for which bail is not available,

"[b]ail set at a figure higher than an amount reasonably calculated [to ensure the defendant's presence at trial] is 'excessive' under the Eighth Amendment." *U.S. v. Salerno*, 481 U.S. 739, 752 (1987) (quoting *Stack v. Boyle*, 342 U.S. at 5). In addition, the Sixth Circuit has held that the denial of bail pending trial, via "cursory orders supplying no reasons . . . violate[s] the standards for due process established by the fourteenth amendment." *Atkins v. People of State of Mich.*, 644 F.2d 543, 550 (6th Cir. 1981). Under the facts at hand, the plaintiffs have presented at least a colorable claim that Wilson County has adopted a policy whereby bail is set excessively and that a substantial class of persons, of which plaintiff is a member, possesses similar claims through the defendant's exercise of that policy.

10

Without citing any case law in its favor, the defendant argues that the plaintiff has not met the numerosity requirement because the plaintiff has not identified any "actual single person or persons" who have been subject to excessive bail, aside from the plaintiff herself. But the plaintiff is not required to name individual members of her proposed class in a Rule 23(b)(2) class action, such as this one, and in fact "the actual membership of the class need not . . . be precisely delimited" through the duration of such an action. *Yaffe v. Powers*, 454 F.2d 1362, 1366 (1st Cir. 1972). Instead, "the conduct complained of is the benchmark for determining whether a subdivision (b)(2) class exists, making it uniquely suited to civil rights actions in which the members of the class are often incapable of specific enumeration." *Id.*; *see also Weathers v. Peters Realty Corp.*, 499 F.2d at 1200 (finding that the numerosity requirement was met where the plaintiff "alleged that there are others of her race 'who are, have been or will be seeking housing' at the defendants' property" in a discrimination action.) In fact, difficulty in defining class members, particularly in an injunction action, is often cited as a factor in favor of numerosity. *See Jack v. American Linen Supply Co.*, 498 F.2d at 124 ("[J]oinder of unknown individuals is certainly impracticable.") The defendant's contention that, in a proposed 23(b)(2) action, the plaintiff must identify specific members of the proposed class in order to satisfy numerosity is without legal basis. The court finds that the plaintiff has met the numerosity requirement.

**B.      Commonality**

In order to meet the commonality requirement, the plaintiff must show that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). The Sixth Circuit has characterized the commonality requirement as "qualitative rather than quantitative" and observed

11

that there need be only one issue common to all members of the class. *American Medical Sys. Inc.*, 75 F.3d at 1080 (citing 1 Herbert B. Newberg & Alba Conte, *Newberg on Class Actions* § 3:10 (3d ed. 1992)). However, not every common issue will satisfy this requirement; the issue must be central, such that its resolution will advance the litigation. *Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 397 (6th Cir. 1998), cert denied, 524 U.S. 923 (1998).

The plaintiff has identified several questions of law or fact common to the class. They are:

1. Is there a practice, pattern or policy within Wilson County of arbitrarily setting bail without an individualized analysis of the pretrial detainees' likelihood to flee or to be a danger to the community?

2. Is bail customarily set by an arbitrary mathematical formula that is subjectively based on the judicial commissioner's beliefs without regard to criteria mandated by law and reasonably related through an objective standard to the purpose behind setting bail?

3. Is bail used for punitive reasons such as for ["]slapping["] the system as a whole, or for being a "jerk" to a police officer?

4. Is bail sometimes denied by a judicial commissioner merely on the request of law enforcement wishing to have more time to gather evidence or to question the suspect? (Docket No. 29 at p. 22.)

Each of these common questions arguably satisfies the commonality requirement, particularly questions one and two, in support of which the plaintiff has already introduced substantial evidence. Although, as the defendant points out, bail was set individually for each proposed member—creating individualized factual scenarios—the above questions of law and fact relate to all of the potential members, because the alleged policy would have applied to them all. The defendant may dispute the existence of that policy or the uniformity if its application, but that dispute by necessity relates to the entire class, and not just to the plaintiff. In fact, whether or not the policy exists is a question not only common to each class member, but

12

actually determinative of any class member's claims in this action. On that basis, the plaintiff has demonstrated commonality.

### C. Typicality

To establish typicality, the plaintiff must show that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). The Sixth Circuit has adopted the following guidelines for analyzing typicality:

> Typicality determines whether a sufficient relationship exists between the injury to the named plaintiff and the conduct affecting the class so that the court may properly attribute a collective nature to the challenged conduct. In other words, when such a relationship is shown, a plaintiff's injury arises from or is directly related to a wrong to a class, and that wrong includes the wrong to the plaintiff. Thus, a plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory. *American Medical Sys.*, 75 F.3d at 1082 (citing 1 Herbert B. Newberg & Alba Conte, *Newberg on Class Actions* § 3-13, at 3-76 (3d ed. 1992) (footnote omitted)).

Or, to put it more succinctly, "as goes the claim of the named plaintiff, so go the claims of the class." *Sprague*, 133 F.3d at 399. The *Sprague* formulation must not be overstated—the plaintiff's claims need not be identical to each putative class member's claims—but rather there must be sufficient factual and legal similarity such that "the interests of the class members will be fairly and adequately protected in their absence." *Falcon*, 457 U.S. at 157.

The court finds that the plaintiff has demonstrated typicality. As discussed above, the plaintiff's claim hinges on the existence of a policy whereby bail is not set in accordance with constitutional and statutory requirements. Should the plaintiff prove that such a policy exists, it will have gone far in demonstrating the need for injunctive relief on behalf of the proposed class. Both the plaintiff's claims and the claims of the class are inextricably tied to the alleged policy. The determinative issue in these cases is not, as the defendants argue, "the individual facts and

circumstances of each individual suspect's facts and circumstances," but rather whether or not Wilson County failed, as a matter of policy, ever to consider those individual facts and circumstances.[2] The plaintiff's claim arises from the same course of conduct—the defendants' practices in setting bail—as the other class members, and is based on the same legal theory—that the practice violates the Fourth, Fourteenth, and Eighth Amendments, as well as Tennessee law—as the other members. Therefore, typicality has been met.

### D. Fair and Adequate Representation

Adequate representation, under Rule 23(a)(4), requires that "(1) [t]he representative must have common interests with unnamed members of the class, and (2) it must appear that the representatives will rigorously prosecute the interests of the class through qualified counsel." *Senter*, 532 F.2d 511, 525 (6th Cir. 1976) (citing *Gonzales v. Cassidy*, 474 F.2d 67, 73 (6th Cir. 1973). The common interests shared between the plaintiff and the unnamed members of the class have already been established. The defendant has given the court no reason to doubt that the plaintiff will "rigorously prosecute the interests of the class through qualified counsel," and therefore, that fair and adequate representation has been established.

Somewhat bizarrely, the defendant argues that a conflict exists between the plaintiff and her proposed class because the plaintiff has alleged both arbitrary and punitive bail in her own case, whereas there may exist some class members for whom bail was set arbitrarily, but not

---

[2] The defendant argues that typicality does not exist because the class members were charged with different crimes. But the nature of the plaintiff's charge is at best peripheral to the proposed class action. The conduct at issue in the class action concerns only the process of setting bail, and the standards that were followed, or not followed, in that process. Those standards apply equally to whatever variety of crimes may be encompassed in this action. Typicality does not require identical facts from class member to class member and will not be defeated by irrelevant differences.

14

punitively. No conflict exists. The Eighth Amendment prohibits bail that is excessive. It does not differentiate between excessive bail that is punitive in nature and excessive bail that is arbitrary. Likewise, the relief sought in this case does not depend on whether bail was set punitively or arbitrarily for any given class member. The injunctive remedy, should it be warranted, would address both situations. The determinative issue for any damage assessment would be whether bail was excessive—its characterization as "arbitrary" or "punitive" would not increase or decrease the damages awarded, but rather, would serve as evidence as to whether or not the bail was in fact excessive. Because the plaintiff alleges both arbitrariness and punitiveness in her individual case, she is in a unique position to represent class members who fall under either category. The court does not find that any conflict exists between the plaintiff and her potential class members.

### III. Rule 23(b) Analysis

Finally, the court must address whether the class action falls under any of the categories set forth in Rule 23(b). The plaintiff proposes that the class be certified under Rule 23(b)(2), which includes situations where "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." Fed. R. Civ. P. 23(b)(2). Because the defendants' response does not address the Rule 23(b)(2) requirements, but rather imagines that the plaintiff seeks class certification under Rule 23(b)(3) and argues against only that ground, the court must analyze this issue without the defendants' aid.

The plaintiff has alleged that the defendants acted or refused to act on grounds generally applicable to the class through operation of a policy that sets bail excessively. In addition, the

15

plaintiff has requested final injunctive relief corresponding to the class as a whole. However, the plaintiff's First Amended Complaint also includes a request for compensatory and punitive damages, and Count II of the First Amended Complaint, which the plaintiff incorporated into its Motion for Class Certification, also anticipates monetary relief. Therefore, since the plaintiff nowhere in her Motion for Class Certification or accompanying briefs renounced her intention to seek damages, the court must address whether her 23(b)(2) class action can support both injunctive and monetary relief.

In *Coleman v. General Motors Acceptance Corp.*, 296 F.3d 443, 447 (6th Cir. 2002), the court held that, with regard to employment claims made under the Equal Credit Opportunity Act, "compensatory damages are not recoverable by a 23(b)(2) class." The court reasoned that, because notice is not mandatory under 23(b)(2), and therefore opting out is unavailable, "close scrutiny is necessary if money damages are to be included . . . in order to protect the individual interests at stake and ensure that the underlying assumption of homogeneity is not undermined." *Id.* at 448. Pointing to the Advisory Committee's directive in the 23(b)(3) context that common issues should "predominate" in class actions, the court held that, in determining whether an action for both injunctive and monetary relief can be maintained under 23(b)(2), the injunctive relief must "predominate." *Id.* As to what "predominate" means in this sense, the court offered the following guidance: "in determining whether injunctive relief predominates in a Rule 23(b)(2) class, one critical factor is whether the compensatory relief requested requires individualized damages determination or is susceptible to calculation on a classwide basis." *Id.*

In addition, the court in *Coleman* noted that "class treatment of claims is most appropriate where it is not economically feasible for individuals to pursue their own claims,"

16

leaving open the possibility that, where the individualized damages are likely to be very low, a 23(b)(2) action including such damages may be maintained. *Id.* at 449; *see also Neal v. Casey*, 43 F.2d 48, 64 (3d Cir. 1994) (stating that the Rule 23(b)(2) option was intended specifically to "foster institutional reform by facilitating suits that challenge widespread rights violations of people who are individually unable to vindicated their own rights"). And, in fact, the Sixth Circuit has, over the course of many years, upheld certification of 23(b)(2) actions including requests for monetary damages on that basis. In *Senter*, 532 F.2d at 525, the Sixth Circuit upheld class certification of a Title VII civil rights action under 23(b)(2) that included a request for damages in the form of back pay. Similarly, in *Weathers v. Peters Realty Corp.*, 499 F.2d at 1200, a civil rights case involving discriminatory housing practices, the court stated, "[o]f course, some or all of the members of a (b)(2) class may seek additional relief, for example, monetary damages, as the present plaintiff has done." The *Weathers* court further elaborated that, "[i]f both injunctive or declaratory relief, and monetary damages are sought, it is permissible under Rule 23(c)(4) to have sub-classes" if the "practical difference" between the plaintiffs seeking injunctive relief and plaintiffs seeking damages "make the division into sub-classes necessary." *Id.*

In the proposed class action, any award of punitive damages could be calculated on a class-wide basis and therefore, under the *Coleman* framework, does not bar 23(b)(2) certification. Compensatory damages, on the other hand, would require individual determinations. However, the compensatory damages at issue—compensation for excessive fees paid to bail bondsmen—fit the classic definition of damages that are not "economically feasible for individuals to pursue their own claims," *Coleman*, 296 F.3d at 449, in that they involve

17

individual damage amounts that would not justify the normal expenses of litigation. And as the court in *Weathers* advised, this court may, if it later becomes necessary, divide the action into sub-classes for the determination of those individualized damages. *Weathers*, 499 F.2d at 1200. Therefore, the court finds that the injunctive relief "predominates" over the requested damages in this case and, therefore, certification under Rule 23(b)(2) is proper.

## **CONCLUSION**

For the reasons stated herein, the court finds that the plaintiff has satisfied the requirements under Rule 23(a) and Rule 23(b)(2), and therefore the plaintiff's motion for class certification will be granted.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge

18